UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.:

LISA DOE,

        Plaintiff,

vs.

DARREN K. INDYKE AND
RICHARD D. KAHN AS JOINT
PERSONAL REPRESENTATIVES OF
THE ESTATE OF JEFFREY E. EPSTEIN,
NINE EAST 71ST STREET, CORPORATION,
FINANCIAL TRUST COMPANY, INC.,
NES, LLC, HBRK ASSOCIATES, INC.,

        Defendants.

_____/

## **COMPLAINT**

    Plaintiff, LISA DOE, by and through her undersigned counsel, for her claims

against Defendants, alleges as follows:

    1.     This action is brought pursuant to 18 U.S.C. §1591 - §1595.  Therefore,

jurisdiction is proper under 28 U.S.C. §1331.

    2.     Plaintiff files this Complaint under a pseudonym in order to protect her

identity because this Complaint makes allegations of a sensitive sexual nature the

disclosure of which, in association with her name, would cause further harm to her.

1

3.     Plaintiff is currently a resident of and domiciled in the State of New York.

4.     At all times material, Jeffrey Epstein was a citizen of the United States and a resident of the U.S. Virgin Islands.

5.     Jeffrey Epstein was a man of extraordinary wealth who travelled between and stayed regularly in multiple residences, including in New York, New York (within the Southern District of New York) at 9 East 71st Street, New York, NY 10021; in Palm Beach, Florida at 358 El Brillo Way, Palm Beach, Florida 33480; in New Mexico at 49 Zorro Ranch Road, Stanley, New Mexico 87056, and in the United States Virgin Islands at Island Little St. James Island No. 6B USVI 00802.

6.     At all times material to this cause of action Jeffrey Epstein was an adult male born in 1953, who died on August 10, 2019.

7.     Defendant, Defendant, Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein ("Estate of Jeffrey E. Epstein") the Estate of Jeffrey E. Epstein was opened and domiciled in the United States Virgin Islands, St. Thomas Division, and is the legal entity responsible for intentional, criminal, or tortious conduct committed by Jeffrey Epstein as described in this Complaint.

8.     At all times material hereto, Defendant Nine East 71st Street, Corporation ("Nine East") was a domestic business corporation conducting business

in New York, with its principal place of business located at 575 Lexington Avenue, Fourth Floor, New York, NY 10022.

9.     At all times material hereto, Defendant Financial Trust Company, Inc. ("Financial Trust"), was and is a U.S. Virgin Islands corporation conducting business in multiple locations including New York.

10.    At all times material hereto, Defendant NES, LLC, ("NES") was and is a domestic limited liability company registered in and conducting business in multiple locations including New York.

11.    At all times material hereto, Defendant HBRK Associates, Inc., ("HBRK") is and was a domestic business corporation registered in and conducting business in multiple locations including New York with a Registered Agent located at 1365 York Avenue, Apartment 28, New York, New York 10021.

12.    Corporate Defendants NES, LLC; Financial Trust Company, Inc; Nine East 71st Street; and HBRK Associates, Inc., referred to as "Corporate Defendants," each performed business, in whole or part, in New York.

13.    Plaintiff intends to amend this complaint to add or substitute additional parties as discovery reveals the identities of other tortious corporate or individual actors.

14.    Jeffrey Epstein, the leader of a complex commercial sex trafficking and abuse ring, was an officer, director, or employee of many corporate entities

registered in various states throughout the United States, one or more of which may also be legally responsible for the crimes he committed against young females, including minors such as Plaintiff.

15.     Additionally, individuals who worked at the residences where sexual criminal acts were committed, or friends or acquaintances who assisted Jeffrey Epstein in committing such violations, or who were employed through, or worked for, numerous other corporate entities whose participation caused or contributed to causing the sexual violations that caused harm to Plaintiff, may additionally be added as defendants once their identities are revealed.

16.     A substantial part of the acts, events, and omissions giving rise to this cause of action occurred in the Southern District of New York; venue is proper in this District.  28 U.S.C. section 1391(b)(2).

17.     At all times material to this cause of action, Jeffrey Epstein (legally represented now through Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein (and referred to herein as "Estate of Jeffrey E. Epstein") and Corporate Defendants owed a duty to Plaintiff to treat her in a non-negligent manner and not to commit, or conspire to commit, or cause to be committed intentional, criminal, fraudulent, or tortious acts against Plaintiff, including any acts that would cause Plaintiff to be harmed through conduct committed against her in violation of 18 U.S.C. §1591 - §1595.

4

## FACTUAL ALLEGATIONS

18.     At all times material to this cause of action, Jeffrey Epstein was an adult male over 45 years old.  Epstein was a tremendously wealthy individual, widely recognized as a billionaire, who used his wealth, power, resources, and connections to commit illegal sexual crimes in violation of federal and state laws and who employed or conspired with other individuals and corporate entities to assist him in committing those crimes or torts or who facilitated or enabled those acts to occur.

19.     Epstein displayed his enormous wealth, power, and influence to his employees; to the employees of the corporate or company entities who worked at his direction; to the victims procured for sexual purposes; and to the public, in order to advance, carry out and conceal his crimes and torts.

20.     At all relevant times, Epstein had access to numerous mansions, as well as a fleet of airplanes, motor vehicles, boats and one or more helicopters.  For example, he regularly traveled by private jet aboard a Boeing aircraft (of make and model B-727-31H with tail number N908JE) or a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).

21.     Jeffrey Epstein also frequently inhabited and travelled between numerous properties and homes, each of which he admitted to being owned or controlled by him, including a Manhattan townhome located at 9 East 71st Street, New York, NY 10021 valued conservatively by Jeffrey Epstein's own admission at

$55,931,000.00; a ranch located at 49 Zorro Ranch Road, Stanley, New Mexico 87056 valued conservatively by Jeffrey Epstein's own admission at $17,246,208.00; a home located at 358 El Brillo Way, Palm Beach, Florida 33480 valued conservatively by Jeffrey Epstein's own admission at $12,380,209.00; an apartment located at 22 Avenue Foch, Paris, France 75116 valued conservatively by Jeffrey Epstein's own admission at $8,672,820.00; an Island located at Great St. James Island No. 6A USVI 00802 (parcels A, B, C); and an Island Little St. James Island No. 6B USVI 00802 (A, B, C). *See* Jeffrey Epstein "Asset Summary – June 30, 2019" filed in Case 1:19-cr-00490-RMB on July 15, 2019 attached hereto as **Exhibit A.**

22.     Jeffrey Epstein controlled or was otherwise affiliated with the corporation or business entities that owned, managed or maintained each of the real properties listed in the preceding paragraph.

23.     The allegations herein concern Jeffrey Epstein's tortious conduct committed against Plaintiff; while at the residence owned by Defendant Nine East. Many such acts were facilitated by Defendant NES or Defendant HBRK.

24.     Epstein had a compulsive sexual preference for young females, some as young as 14 years old, and acted on that sexual preference for decades.

25.     Epstein enjoyed sexual contact with young females, including minor children, and also took pleasure corrupting vulnerable and innocent young females, including minor children, into engaging in sexual acts with him.

26.     Epstein directed a complex system of individuals, including employees and associates of Defendant entities, to work in concert and at his direction, for the purpose of harming teenage girls through sexual exploitation, abuse and trafficking.

27.     It was widely known among individuals regularly in Epstein's presence that he obtained pleasure from corrupting and inducing vulnerable young females into engaging in uncomfortable and unwanted sexual acts for his own gratification.

28.     Epstein's illegal sexual activities were investigated by law enforcement on at least two occasions, once in 2005-2008 by the United States Attorney for the Southern District of Florida, and more recently by the United States Attorney for the Southern District of New York.

29.     On July 2, 2019, the United States Attorney's Office for the Southern District of New York filed a Sealed Two Count Indictment including One Count of Sex Trafficking Conspiracy and One Count of Sex Trafficking for violations of 18 U.S.C. §1591, in part due to Epstein's criminal activities against children in the New York Mansion located at 9 East 71st Street.

30.     On July 8, 2019, Jeffrey Epstein was arrested pursuant to the aforementioned Indictment, which is attached hereto as **Exhibit B**.

31.     The Indictment stated in part, and Plaintiff herein adopts as true and relevant to her Complaint, that "Jeffrey Epstein, the defendant, enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York (the "New York Residence") and his estate in Palm Beach, Florida (the "Palm Beach Residence") to engage in sex acts with him, after which the victims were given hundreds of dollars in cash."  Criminal Indictment at 1.

32.     "Moreover, and in order to maintain and increase his supply of victims, Epstein also paid certain of his victims to recruit additional girls to be similarly abused by EPSTEIN.  In this way, EPSTEIN created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach."  Criminal Indictment at 1-2.

33.     "The victims described herein were as young as 14 years old at the time they were abused by Jeffrey Epstein, and were, for various reasons, often particularly vulnerable to exploitation.  Epstein intentionally sought out minors and knew that many of his victims were in fact under the age of 18, including because, in some instances, minor victims expressly told him their age."  Criminal Indictment at 2.

34.     "In creating and maintaining this network of minor victims in multiple states to sexually abuse and exploit, JEFFREY EPSTEIN … worked and conspired with others, including employees and associates who facilitated his conduct by, among other things, contacting victims and scheduling their sexual encounters with

EPSTEIN at the New York Residence and at the Palm Beach Residence."  Criminal Indictment at 2.

35.     The indictment further explained, and Plaintiff adopts and alleges, that, "[v]ictims were initially recruited to provide 'massages' to Epstein, which would be performed nude or partially nude, would become increasingly sexual in nature, and would typically include one or more sex acts."  Criminal Indictment at 3.

36.     "Epstein abused numerous minor victims at the New York Residence by causing these victims to be recruited to engage in paid sex acts with him." Criminal Indictment at 3.

37.     In addition to the allegations in the criminal indictment referenced above, Epstein also utilized a similar, if not the same, scheme many years before the time period that was charged and many years after, as well as in additional locations nationally and internationally.

38.     Corporate Defendants enabled Jeffrey Epstein to receive daily massages from young females, often minors, who were not experienced in massage. Rather than receive regular body massages, Epstein was predictably sexually abusing the young females, including Plaintiff, in violation of New York Penal Law Section 130.

39.     Additionally, employees of the various Corporate Defendant performed actions or failed to perform actions that further placed victims, including Plaintiff,

in danger of being sexually abused by Epstein, and assisted in the concealment of his sexually abusive acts.

40.     Defendants employed many recruiters of young females, or directed employees of his related companies, to recruit young females.  In order to grow the enterprise and satisfy his insatiable sexual desire, Epstein and those working at his direction enabled victims themselves to elevate their status within the enterprise to that of a paid recruiter of other victims, an elevation only made possible through the assistance of Defendants.

41.     Recruiters were taught by Jeffrey Epstein or by employees of Corporate Defendants to inform targeted young female victims that Epstein possessed extraordinary wealth, power, resources, and influence; that he was a philanthropist who would help female victims advance their education, careers, and lives; and that she only needed to provide Epstein with body massages in order to avail herself of his nearly unlimited assistance and influence.

42.     Epstein and Corporate Defendants and their many employees fulfilled Epstein's compulsive need for sex with young females by preying on their personal, psychological, financial, and related vulnerabilities. Epstein and Defendants' tactics included promising the victims money, shelter, transportation, gifts, employment, admission into educational institutions, educational tuition, profession, licensure, protection, healthcare, and other things of value.

43.     Jeffrey Epstein's sexual attraction to young, often underage, females dated back to at least the mid-nineties and the number of victims increased substantially with the necessary assistance from Defendants and Defendants' employees.

44.     Defendants, at the direction of Epstein or in furtherance of his demands, and with help from assistants, associates and underlings, and even other victims, recruited or procured dozens if not hundreds of young females, including minors, for the purpose of Epstein's sexual gratification.

45.     Jeffrey Epstein, and employees of certain Corporate Defendants, including at least Defendant HBRK, specifically targeted underprivileged, emotionally vulnerable and/or economically disadvantaged young females to sexually molest and abuse.

46.     Additionally, Jeffrey Epstein and Corporate Defendants, through employees, informed young females, including Plaintiff, that Jeffrey Epstein was wealthy, well-connected, and had the power and ability to impact the life of any young female recruited or obtained to provide a massage.

47.     Each of the Corporate Defendants committed acts of negligence that allowed for Epstein to commit acts in violation of New York Penal Law section 130.

48.     Each of the Defendants committed acts against Plaintiff in violation of 18 U.S.C. §1591 - §1595.

11

## LISA DOE

49.     Upon information and belief, Plaintiff, LISA DOE met Jeffrey Epstein in 2002 when she was seventeen years old.

50.     Plaintiff was an avid dancer with a promising future as a professional dancer.

51.     Associate 2 approached Plaintiff at her dance studio located in New York, New York, seeking to hire Plaintiff to teach a dance-based exercise class at the home of a wealthy man in the City.

52.     Plaintiff went to Defendant Nine East's property located at 9 East 71st Street, New York, New York to provide such lessons.

53.     Upon arrival at the residence, Associate 5 opened the door and invited Plaintiff into the home.

54.     Jeffrey Epstein then escorted Plaintiff to the gym in the residence, which contained a ballet style bar that he informed her could be used for the exercise class.

55.     Jeffrey Epstein engaged in conversation with Plaintiff about dance wherein Plaintiff informed Jeffrey Epstein of her dream to be a professional dancer.

56.     Jeffrey Epstein informed Plaintiff that he was closely connected to many major dance companies in New York City and that he was close personal friends with some of the most influential names in dance.

57.     Jeffrey Epstein informed Plaintiff that he would provide Plaintiff with top-of-the-line dancing attire, including new ballet pointe shoes, and use his resources to further her career.

58.     After making these representations during the initial encounter, Jeffrey Epstein required Plaintiff to engage in various sexually-charged stretching activities, and did not allow her to teach the exercise dance class that she had prepared to teach.

59.     Jeffrey Epstein told Plaintiff of his extraordinary resources and connections to the most powerful people in the world, convincing Plaintiff that he was capable of fulfilling his promise to use his resources to accelerate her dance career.

60.     As Jeffrey Epstein was leading Plaintiff out of the mansion, he introduced her to Prince, who was there visiting as a close personal friend.  Prince engaged in conversation with Jeffrey Epstein and Plaintiff, who was shocked that someone as powerful as a royal family member would be engaging in small talk with her.

61.     The fact that Jeffrey Epstein introduced Plaintiff to Prince the very first time she was ever at the home owned by Defendant, Nine East, was part of Jeffrey Epstein's and those affiliated with his enterprise's scheme, plan, or pattern intended to cause Plaintiff to believe that  he could advance her career if she cooperated with

him or, conversely, if she failed to comply with any demands made by Jeffrey Epstein, he had the ability to and would cause Plaintiff serious harm.

62.     Before she left the property of Defendant, Nine East, Jeffrey Epstein told Plaintiff that she had done a good job and asked her to return the following day for another session.

63.     During the second session, Jeffrey Epstein was again only interested in sexually-charged stretching activities that involved Plaintiff's sitting on top of his body and pressing her body up against his in other manners.

64.     Jeffrey Epstein again spent the session discussing the ways in which he could use his wealth, power, and connections to make Plaintiff a star in the dance world.

65.     After being promised that her career as a professional dancer was about to begin and reasonably believing that Jeffrey Epstein would in fact use his means to propel her career to the next level, Plaintiff returned to her dance studio more motivated than ever to continue training.

66.     After dance class, Plaintiff received a telephone call from Associate 2, who informed her that Jeffrey Epstein had enjoyed the previous two sessions, but that he would like her to return to give him a massage instead.

67.     Associate 2 further informed Plaintiff that she would be paid $100 per hour to conduct the massage with her clothing on, or she could be paid $300 per hour to perform the massage with her clothes off.

68.     After explaining to Associate 2 that she had never given a massage before, Plaintiff agreed to return and try her best, but expressed that she wasn't sure she was comfortable with the options provided to her by Associate 2.

69.     When Plaintiff arrived at Defendant, Nine East's, property, she was told to wait in the foyer before being led to the massage room.  She had never been in the massage room because her previous experiences with Jeffrey Epstein had occurred in the gym.

70.     Jeffrey Epstein entered the massage room and began to instruct Plaintiff on how to properly massage him.  With literally no experience in massage, Plaintiff listened to Jeffrey Epstein very intently, knowing that she had to comply with his demands if she wanted him to use his connections to help her—and, conversely, not punish her if she failed to comply—with her dance career.

71.     Jeffrey Epstein instructed Plaintiff to apply pressure to certain parts of his body, instructing her in detail on the motions that she should make and how she should make them.

72.     Jeffrey Epstein then instructed Plaintiff to squeeze his nipples as hard as she could.  When Plaintiff confusedly complied, Jeffrey Epstein unexpectedly used a sex toy on her, forcibly pressing it onto and into Plaintiff's vagina.

73.     Jeffrey Epstein then began to touch himself while he continued to hold the vibrating sex toy on and in Plaintiff's vagina.

74.     Once Epstein finished masturbating, he brought Plaintiff into his closet and grabbed a book from the stack of "Massage for Dummies" books that he had piled up on the floor.

75.     Jeffrey Epstein handed the book to Plaintiff and instructed her to read the entire publication before the next time she saw him.  He then opened a drawer and handed Plaintiff three one hundred-dollar bills.

76.     Jeffrey Epstein and the enterprise he directed, which operated through his direct employees and associates as well as related Corporate Defendants and employees thereof, began to groom Plaintiff for sexual exploitation as soon as they met her.  She was immediately provided with money and gifts for the purpose of causing her to feel indebted to Jeffrey Epstein and maintaining her for the purposes of engaging in commercial sex.

77.     Jeffrey Epstein, and others who acted under his direction including employees for Defendants, immediately seized upon Plaintiff's desire to succeed in

the dance world in order to control and manipulate Plaintiff into full cooperation with the enterprise and compliance with Jeffrey Epstein's perverted sexual motives.

78.     Despite having been sexually assaulted by Jeffrey Epstein, Plaintiff, feeling as though she had no choice, especially in light of the promises and implied threats she had received, returned to Defendant, Nine East's New York mansion, on many occasions where she was continually sexually abused, and after each such occasion was paid hundreds of dollars.

79.     Plaintiff continued to reasonably rely upon Jeffrey Epstein's promises and representations, which caused her to return many times and be subjected to sexual abuse.   Plaintiff was also coerced into cooperating with Epstein by her reasonable fear that if she did not cooperate Epstein and the many others who acted as his direction, including Corporate Defendants, would cause her serious harm.

80.     Plaintiff was made to understand by Jeffrey Epstein and others that if she remained loyal and obedient to him, he would provide her with the dance training and connections she needed to succeed, and, conversely, if she did not remain loyal and obedient to him he would prevent her from becoming a professional dancer all together.   In addition, the scheme or plan orchestrated by Jeffrey Epstein and other employees and associates was designed to cause Plaintiff to believe that if she failed to perform commercial sex acts with Jeffrey Epstein, she would suffer financially, reputationally, and in other ways.

81.     After the initial sexual encounter, Plaintiff was fraudulently lured by members of Jeffrey Epstein's enterprise, including Jeffrey Epstein himself, to visit Defendant, Nine East's property, on a regular basis to engage in commercial sex acts with Jeffrey Epstein.

82.     At the direction of Jeffrey Epstein, Plaintiff was paid hundreds of dollars in cash to participate in each commercial sex act by various employees or associates of the sex trafficking enterprise between the time she met Jeffrey Epstein and 2010.

83.     In addition to cash, other value was conferred upon Plaintiff for her participation in commercial sex acts including, but not limited to, money for dance attire, dance classes, living expenses, and educational courses, among other things.

84.     Payment for dance classes, educational courses, and other expenses were made at the direction of Jeffrey Epstein, Defendant NES, and Defendant HBRK, in furtherance of the venture and in exchange for the commercial sex acts.

85.     In addition to regularly engaging in commercial sex acts with Jeffrey Epstein from the time that she met him through and including 2010, Jeffrey Epstein would direct Plaintiff to engage in commercial sex acts with other females while he pleasured himself or acted for his own gratification, also in exchange for money or other financially valuable forms of compensation.

86.     As part of his scheme, plan, or pattern, Jeffrey Epstein needed to transform Plaintiff into a recruiter of young girls given that, despite her very young appearance, she was "aging out" of his sexually desired age range.

87.     Jeffrey Epstein and his associates demanded that Plaintiff bring other girls for Jeffrey Epstein to engage in commercial sex acts with.

88.     Jeffrey Epstein and his associates specifically instructed Plaintiff to go to her dance studio and find other dancers to bring to the property owned by Defendant, Nine East to provide Jeffrey Epstein with a "massage."

89.     In addition to complying with the demand to bring other girls to meet Jeffrey Epstein, Plaintiff continued to engage in commercial sex acts herself with Jeffery Epstein because of his continued promise to use his power and connections to help her become a professional dancer.

90.     Additionally, Plaintiff had seen Jeffrey Epstein very angry and very forceful and talk about wielding his power in threatening ways, thereby causing Plaintiff to be afraid to refuse Jeffrey Epstein's demands because she knew that he was a powerful man with many connections who could and would cause her serious harm, financially, reputationally, and in other ways, including in the dance world, if she did not strictly comply with his sexual demands.

91.     Jeffrey Epstein, and members of his enterprise, at his direction, would provide Plaintiff with things of lesser value such as dance attire, dance classes, living

expenses, and educational courses, among other things, so that she would continue to engage in commercial sex acts with Jeffrey Epstein in reasonable reliance upon his knowingly false promise to get her a job as a professional dancer. Jeffrey Epstein intentionally dangled this ultimate promise in front of Plaintiff to induce her into complying with his demands.

92.     Furthermore, Plaintiff continued to engage in commercial sex acts with Jeffrey Epstein through 2010 because, based on his previous behavior, she reasonably believed that her failure to do so would result in serious reputational and other harm given Jeffrey Epstein's vast knowledge of the New York dance community.

93.     For as long as Plaintiff can remember, her dream was to become a professional dancer. Because she had not ever considered an alternative career path, Plaintiff did not have a formal education, nor did she have any technical training. Plaintiff only had her dance career and the promises made to her by Jeffrey Epstein.

94.     Jeffrey Epstein knew that Plaintiff only had her dream of becoming a professional dancer when he first met her. Being the controlling and deliberately manipulative person that he was, Jeffrey Epstein knowingly and intentionally seized on Plaintiff's vulnerability by exploiting that dream.

95.     As he always did, Jeffrey Epstein engaged in his typical scheme, plan, or pattern in order to compel her to commit commercial sex acts, thereby corrupting

Plaintiff and transforming her into the young female that he solicited, harbored, and enticed to engage in commercial sex acts.

96.     In order to ensure compliance from her and cooperation as a victim of this indoctrination into his commercial sex act scheme, Jeffrey Epstein made false promises to her to the effect that so long as she cooperated, he would use his money, connections, and resources to fulfill her dream of becoming a professional dancer, and that he would provide her with the life that she had always wanted.

97.     Those promises, along with the obvious appearance demonstrating that he had the ability to fulfill those promises, compelled Plaintiff to engage in commercial sex acts that she otherwise never would have engaged in.

98.     In furtherance of causing her reasonable reliance on those promises, Jeffrey Epstein did indeed have significant connections in the dance profession including connections with the best dance companies, dance instructors, and dance professionals in the world.  As a result, Plaintiff reasonably believed that if she did not engage in the commercial sex acts, she  would be seriously harmed.

99.     On July 22, 2008, Jeffrey Epstein went to jail in Florida for sexual crimes that he had committed against minor children.

100.    In or about August 2008, Defendant HBRK Associates, Inc. ("HBRK") was incorporated in New York, New York.

101.    Upon information and belief, Defendant HBRK employed numerous individuals whose primary, if not exclusive, objective was to commit violations of 18 USC Section 1591.  Specifically, HBRK employees were designated to fulfill different roles in recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, or soliciting by any means, young females, including Plaintiff, knowing that fraud or coercion would be used to cause that female, including Plaintiff, to engage in a commercial sex act.

102.    At all times material hereto, employees of Defendant, HBRK, worked for and at the direction of Jeffrey Epstein.

103.    Certain employees of Defendant, HBRK, were: 1) recruiters who spent their time and energy developing ways in which to recruit young females for Jeffrey Epstein who were enticed to commit commercial sex acts with him as a result of coercion or fraud; 2) schedulers responsible for maintaining the schedule of the dates and times when young girls would be maintained "on call" for the purpose of committing commercial sex acts; 3) other employees of Defendant, HBRK, responsible for paying the victims of 18 U.S.C. §1591 crimes to conceal the criminal enterprise; and 4) certain employees responsible for providing valuable services or items of value to victims of sex trafficking offenses such as money, gifts, living quarters, housing, dental treatment, food, medical treatment, hair and beauty treatments, as well as living arrangements, travel arrangements, educational

arrangements furthering the commercial sex act, and 5) other employees who concealed the criminal sex trafficking enterprise.

104.     Between approximately 2002 and 2010, Jeffrey Epstein, in concert with and through the assistance of numerous other individuals and related corporate entities, including Corporate Defendants and employees thereof, recruited, enticed, harbored, transported, obtained, maintained, or solicited Plaintiff knowing that means of fraud and coercion were being used to cause Plaintiff to engage frequently in commercial sexual acts that were continual and frequent during each of those years.

105.     In implementing his scheme, plan, or pattern, Jeffrey Epstein made it clear to Plaintiff that there were many powerful people behind him.  In fact, some of the most powerful people in the world were his best friends.  He not only surrounded himself with these types of people, he also bragged about how he controlled them.

106.     In order to cause Plaintiff to engage in each commercial sex act, Jeffrey Epstein and his co-conspirators, associates, employees, and related corporate entities, including Corporate Defendants, used coercion, and knew that coercion would be used, in order to cause Plaintiff to engage in such acts.

107.     Jeffrey Epstein and various associates, employees, and related corporations and employees, including Corporate Defendants, worked in concert together as an enterprise with extraordinary power, wealth, and resources capable of

impacting Plaintiff's life in positive or negative ways depending on her level of cooperation, a fact known to Plaintiff.

108.    Jeffrey Epstein and others associated with Jeffrey Epstein, including employees of Defendant HBRK, bragged about Jeffrey Epstein's unusual political and powerful connections and his ability to obtain education, housing, medical needs, or other things of value for young females who cooperated with Jeffrey Epstein's sexual demands.

109.    In addition to being explicitly reminded by Jeffrey Epstein, or one of his associates, of his extraordinary power to reward and punish, his power to do so was apparent to Plaintiff, inasmuch as she visited Jeffrey Epstein many times at the New York townhouse, located at 9 East 71 Street, New York, New York, owned by Defendant, Nine East, which has been reported as the largest single residence in Manhattan, and knew that this was where Jeffrey Epstein resided when in New York.

110.    Under Jeffrey Epstein's control were numerous companies with many employees and obvious resources, each of whom worked for the Jeffrey Epstein enterprise.  While the individuals were employees of various Jeffrey Epstein related companies, including Defendant Corporations, it was clear through explicit words and appearances that all such employees acted at Epstein's direction and for his protection.    This team of individuals included chefs, butlers, receptionists,

schedulers, secretaries, flight attendants, pilots, housekeepers, maids, sex recruiters, drivers and other staff members.

111.    Each of the employees and associates were paid through companies believed to have been funded by Jeffrey Epstein and, regardless of such funding, were disciples of Jeffrey Epstein, constantly informing Plaintiff and other victims of Jeffrey Epstein's power and ability to improve or destroy a victim's life depending on her level of cooperation.

112.    The main function of each of the associates who acted at the instruction or direction of Jeffrey Epstein was to recruit, entice, harbor, transport, provide, obtain, maintain, or solicit young females, knowing that fraud or coercion would be used to cause that female, including Plaintiff, to engage in a commercial sex act.

113.    Each such associate described above was also employed to perform functions in order to avoid detection of the illegality of Epstein's commercial sex trafficking and to forever conceal the enterprise.

114.    One significant element used to compel commercial sex acts of young females, including Plaintiff, and to avoid detection of the sex trafficking ring, was the design of the scheme or pattern intended to cause a person to believe that failure to perform an act would result in serious psychological, financial or reputational harm.

115.    By the time he was released from jail in 2009, Jeffrey Epstein's scheme had worked.  Plaintiff was completely reliant upon him.

116.    By this time, Plaintiff was 24 years old, did not have a formal education, and her window of opportunity to become a professional dancer was closed or quickly closing.

117.    Jeffrey Epstein had spent years ensuring that Plaintiff no longer had her own connections to the dance world.  In doing so, he gave her the reasonable belief that failure to engage in commercial sex acts would cause her reputational harm.

118.    Jeffrey Epstein had selected, coordinated, and paid for Plaintiff's dance training for many years.  In fact, he had been in complete control of her dance career for seven years or more.

119.    Jeffrey Epstein intentionally deployed a scheme to obtain this complete level of control over Plaintiff's dance career with knowledge that he never intended to fulfill the promise that Plaintiff had reasonably relied upon because he knew that he could not risk losing Plaintiff to the dance world, which would inevitably occur if he followed through and used his connections to make her a professional dancer, a career for which she had the natural talent and ability.  Losing control over Plaintiff and her schedule was never an acceptable option for Epstein.

120.    Jeffrey Epstein knew there was a risk that Plaintiff could soon learn that he had never intended to use his wealth, power, and connections to help her with her dance career.

121.    However, by this point, Jeffrey Epstein had grown reliant upon Plaintiff to engage in commercial sex acts with him and to bring other young girls to him to provide him with so-called "massages."

122.    Jeffrey Epstein knew it was imperative for him to maintain control over Plaintiff and other individuals like her, especially while he was in jail and unable to employ his scheme, plan, or pattern as frequently and regularly as he did when out of jail, or to recruit, entice, maintain, and solicit young girls through fraud or coercion to engage in commercial sex acts with him.  He needed to ensure that Plaintiff would still remain available for him when he was released from jail and returned to New York.

123.    Rather than finally fulfill the false promise that he had used to cause Plaintiff to engage in commercial sex acts with him for many years, Jeffrey Epstein created a new fraud.

124.    He switched his method of operation and attempted to force Plaintiff into other professions where he had strong connections and could maintain complete control of her life.

125.    This was a scheme to one employed by Jeffrey Epstein and his many associates with numerous victims in order to coerce them into continuing to engage in commercial sex acts with him.

126.    His scheme was centered around controlling Plaintiff's legitimate world so that if she did not cooperate in his illegitimate world, he could destroy whatever possibility she had of succeeding in her legitimate career.  Jeffrey Epstein made sure Plaintiff knew he was capable of doing that.

127.    In furtherance of his scheme, Jeffrey Epstein caused Plaintiff to believe that her failure to engage in his illegitimate world would result in serious harm.

128.    Knowing she had that reality in mind, Jeffrey Epstein forced Plaintiff to seek a profession as a masseuse, an ironic choice since he had lured Plaintiff into committing commercial sex acts by hiring her supposedly to give him massages. Now, years later, she still did not have massage training.

129.    Jeffrey Epstein made this proposition to Plaintiff in order to create the illusion of a legitimate profession for her, separate and distinct from the illegal, illegitimate, and exploitative life she had been suffering with at the hands of Jeffrey Epstein, Defendants, and their criminal enterprise.

130.    Because she did not have any knowledge of the legitimate massage industry, nor did she have any contacts to help get begin such training, Plaintiff could only rely upon Jeffrey Epstein both to teach her and recommend her to clients.  With

these steps in mind, it was clear to Plaintiff and Epstein that if she did not cooperate with him and comply with the demands that he made, he could take this new legitimate massage profession away from her as quickly as he had given it to her.

131.    By this time, Jeffrey Epstein controlled every aspect of Plaintiff's reputational and financial life.

132.    Turning his young, illegitimate masseuses into legitimate masseuses was a common scheme of Jeffrey Epstein.  He did this in an effort to add apparent legitimacy to his illegal commercial sex acts.

133.    As part of his scheme, plan, or pattern to indoctrinate Plaintiff into acceptance of his illegal enterprise, Jeffrey Epstein attempted to legitimize the art of massage.

134.    Despite the fact that Plaintiff had been providing Jeffrey Epstein with so-called "massages" for many years, she did not have any training nor did she actually know how to perform a legitimate massage.

135.    Rather than provide her with formal training, which she did not have, Jeffrey Epstein required Associate 6 to provide Plaintiff with three different massage "trainings" wherein Associate 6 would provide Plaintiff with a massage and explain the various techniques she was employing in an effort to have Plaintiff learn something about legitimate massage despite. This was done by Associate 6 even though she herself did not possess any formal training or licensure.

29

136. Jeffrey Epstein would not allow Plaintiff to acquire outside training or massage licensure.

137. Given that Jeffrey Epstein had controlled the manner in which Plaintiff received the only massage training she was ever going to receive, Jeffrey Epstein was in control of all aspects of that training, legitimate or otherwise, including where Plaintiff would work, when she would work, and by whom she would be employed.

138. As further evidence of his control, Jeffrey Epstein created an entire scheme to have Plaintiff employed as a masseuse on his own dime while she was working for other organizations.

139. As an example, in exchange for Plaintiff's engaging sex acts with Jeffrey Epstein, Jeffrey Epstein made a $10,000 donation to a particular dance company on condition that the dance company used the donated funds only to pay for Plaintiff's providing massage services to the dancers of the company.

140. Plaintiff continued to engage in commercial sex acts with Jeffrey Epstein for which she was compensated through these massage donation packages.

141. Plaintiff knew that if she did not engage in commercial sex acts with Jeffrey Epstein at his request, or if she did not comply with his demands to bring other girls to provide him with so-called "massages," then he would cause her both financial and reputational harm, including ruining her professional reputation in the massage community, thus ruining her sole or primary legitimate source of income.

142.     Moreover, if Plaintiff did not comply and Jeffrey Epstein used his power to turn the dance companies for whom she was providing massage services against her, her reputation as a legitimate masseuse would be ruined and her reputation in the dance community at large would be destroyed.

143.     Jeffrey Epstein's plan, scheme, or pattern was so intricate that from beginning to end he was employing fraud and coercion in order to entice Plaintiff to engage in commercial sex acts and ensured her compliance by causing his victims, including Plaintiff, to believe that failure to perform as demanded would result in serious financial and reputational harm.

144.     In conducting his scheme with Plaintiff, Jeffrey Epstein was able convert one act of fraud—the making of false and coercive promises to aid Plaintiff's dance career—into another act of fraud—the making of false and coercive promises to aid her in the profession of massage.   He executed his scheme as a way of regarding enticing and soliticing her into committing commercial sex acts.

145.     The totality of the circumstances created by Epstein was intended to make Plaintiff believe that if she failed to continue engaging in commercial sex acts Jeffrey Epstein could withdraw every other positive aspect of her life away from her. As a result of his scheme, Plaintiff was trapped.   She knew that the moment she failed to allow Jeffrey Epstein to commit sexual acts against her he had the ability,

which he would use, to withdraw, damage or destroy all legitimate aspects of her life.

146.    This fraudulent scheme of Epstein's constituted acts of coercion from beginning to end, from 2002 through 2010, inasmuch as the scheme was designed and caused Plaintiff to believe that her failure to perform any sex act required by Epstein would result in serious financial or reputational harm to her.

## COUNT I
## BATTERY AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E. EPSTEIN

147.    The Plaintiff adopts and realleges paragraphs 1 through 146 above.

148.    Jeffrey Epstein committed a harmful or offensive touching against Plaintiff.

149.    As a direct and proximate result of Jeffrey Epstein's battery, the Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT II
### BATTERY/VIOLATION OF SECTION 130
### AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E. EPSTEIN

150.    The Plaintiff adopts and realleges paragraphs 1 through 146 above.

151.    The intentional acts of Jeffrey Epstein against Plaintiff constitute a sexual offense as defined in New York Penal Law § 130, including but not limited to the following:

    a. Sexual misconduct as defined in §130.20 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff without Plaintiff's consent;

    b. Rape in the first degree as defined in §130.35 inasmuch as Jeffrey Epstein engaged in sexual intercourse with Plaintiff by forcible compulsion;

    c. Criminal sexual act in the first degree as defined in §130.50 inasmuch as Jeffrey Epstein engaged in oral sexual conduct with Plaintiff by forcible compulsion;

    d. Forcible touching as defined in §130.52 inasmuch as Jeffrey Epstein, intentionally and for no legitimate purpose, engaged the forcible sexual touching of Plaintiff for the purpose of degrading or abusing her or for the purpose of gratifying his own sexual desire; and

e. Sexual abuse in the third degree as defined in §130.66 inasmuch as Jeffrey Epstein inserted a foreign object in the vagina of Plaintiff by forcible compulsion.

152.     As a direct and proximate result of Jeffrey Epstein's violations of New York Penal Law § 130, Plaintiff has in the past suffered and in the future will continue to suffer physical injury, pain, emotional distress, psychological trauma, mental anguish, humiliation, embarrassment, loss of self-esteem, loss of dignity, invasion of her privacy and a loss of her capacity to enjoy life, as well as other damages.  Plaintiff incurred medical and psychological expenses and Plaintiff will in the future suffer additional medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer these losses in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT III**
**CAUSE OF ACTION AGAINST DARREN K. INDYKE AND RICHARD D. KAHN AS JOINT PERSONAL REPRESENTATIVES OF THE ESTATE OF JEFFREY E. EPSTEIN PURSUANT TO 18 U.S.C. § 1595**

153.     Plaintiff adopts and realleges paragraphs 1 through 146 above.

154.     Jeffrey Epstein, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited, threatened, forced, or coerced Plaintiff to engage in commercial sex acts.

155.     Such actions were undertaken knowing that his use of force, threats of force, fraud, coercion, and/or combinations of such means would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Jeffrey Epstein violated 18 U.S.C. §1591.

156.     Furthermore, Jeffrey Epstein attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

157.     Jeffrey Epstein conspired with each member of the enterprise, and with other persons known and unknown, to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(c).

158.     By virtue of Jeffrey Epstein's violations of 18 U.S.C. §§ 1591, 1593A, and 1594,  Defendant Darren K. Indyke and Richard D. Kahn as Joint Personal Representatives of the Estate of Jeffrey E. Epstein ("Estate of Jeffrey E. Epstein") is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of the violations.

159.    Certain property of  Epstein's was essential to the commission of the federal crimes and torts described herein, including the use of multiple private aircraft including a Boeing aircraft (of make and model B-727-31H with tail number N908JE) and a Gulfstream aircraft (of make and model G-1159B with tail number N909JE).  Such aircraft, along with other of Jeffrey Epstein's property, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

160.    Additionally, Jeffrey Epstein's New York mansion, located at 9 East 71st Street, New York, New York, in the Southern District of New York, and his private island located in the United States Virgin Islands, were used as means and instruments of Jeffrey Epstein's tortious and criminal offenses and, as such, are subject to forfeiture.

161.    As a direct and proximate result of Jeffrey Epstein's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions.  Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature

and Plaintiff will continue to suffer from them in the future. In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against the Estate of Jeffrey E. Epstein for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT IV
### CAUSE OF ACTION AGAINST
### NINE EAST 71ST STREET, CORPROATION
### PURSUANT TO 18 U.S.C. § 1595

162.     Plaintiff adopts and realleges paragraphs 1 through 146 above.

163.     Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff from 2007 through 2010.

164.     Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts. In doing so, Defendant corporation violated 18 U.S.C. §1591.

165.     Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591. In so doing, violated 18 U.S.C. § 1594(a).

166.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

167.    By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

168.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

169.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In

addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Nine East 71st Street, Corporation for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

**COUNT V**
**CAUSE OF ACTION AGAINST**
**FINANCIAL TRUST COMPANY, INC.**
**PURSUANT TO 18 U.S.C. § 1595**

170.    Plaintiff adopts and realleges paragraphs 1 through 146 above.

171.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

172.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

173.    Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a

venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

174.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

175.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

176.    By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

177.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

178.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain;

emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, Financial Trust Company, Inc., For compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT VI
### CAUSE OF ACTION AGAINST NES, LLC
### PURSUANT TO 18 U.S.C. § 1595

179.    Plaintiff adopts and realleges paragraphs 1 through 146 above.

180.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

181.    Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

182.    Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

183.    Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

184.    By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

185.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

186.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595,

Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, NES, Inc., for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper.  Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

### COUNT VII
### CAUSE OF ACTION AGAINST
### HBRK ASSOCIATES, INC.
### PURSUANT TO 18 U.S.C. § 1595

187.    Plaintiff adopts and realleges paragraphs 1 through 146 above.

188.    Defendant, by and through its management and personnel, within the special maritime and territorial jurisdiction of the United States, in interstate and foreign commerce, and/or affecting interstate and foreign commerce, knowingly

recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, solicited by any means Plaintiff.

189.   Defendant, by and through its management and personnel, knew that means of fraud or coercion, and/or combinations of such means, would be used, and were in fact used, in order to cause Plaintiff to engage in commercial sex acts.  In doing so, Defendant corporation violated 18 U.S.C. §1591.

190.   Defendant, by and through its management and personnel knowingly benefitted, financially and by receiving things of value, from participating in a venture (the Epstein sex trafficking venture enterprise) which had engaged in acts in violation of 18 U.S.C. § 1592 and 1595(a), knowing that the venture had engaged in such violations.  In so doing, Defendant corporation violated 18 U.S.C. § 1593A.

191.   Furthermore, Defendant corporation attempted to violate 18 U.S.C. § 1591.  In so doing, violated 18 U.S.C. § 1594(a).

192.   Defendant, by and through its management and personnel, conspired with other members of the enterprise, and with other persons and companies, known and unknown, to violate 18 U.S.C. § 1591.  In so doing, Defendant violated 18 U.S.C. § 1594(c).

193.   By virtue of their violations of 18 U.S.C. §§ 1591, 1593A, and 1594, Defendant is subject to civil causes of action under 18 U.S.C. § 1595 by Plaintiff, who is a victim of their violations.

194.    Defendant, by and through its management and personnel, participated in a venture with Jeffrey Epstein's enterprise by knowingly recruiting, transporting, soliciting, obtaining, and maintaining Plaintiff knowing that fraud or coercion would be used to cause Plaintiff to commit a commercial sex act.

195.    As a direct and proximate result of Defendant corporation's commission of the aforementioned criminal offenses enumerated in 18 U.S.C. § 1591, 1593A, and 1594, and the associated civil remedies provided in § 1595, Plaintiff has in the past suffered and will continue to suffer injury and pain; emotional distress; psychological and psychiatric trauma; mental anguish; humiliation; confusion; embarrassment; loss of self-esteem; loss of dignity; loss of enjoyment of life; invasion of privacy;  and other damages associated with ' actions. Plaintiff will incur further medical and psychological expenses.  These injuries are permanent in nature and Plaintiff will continue to suffer from them in the future.  In addition to these losses, Plaintiff has incurred attorneys' fees and will be required do so in the future.

WHEREFORE, Plaintiff demands judgment against Defendant, HBRK Associates, Inc., for compensatory and general damages, attorney's fees, punitive damages and such other and further relief as this Court deems just and proper. Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  August 20, 2019.



Respectfully Submitted,

EDWARDS POTTINGER, LLC

By:  */s/ J. Stanley Pottinger*
 J. Stanley Pottinger
 1930 Broadway, Suite 12 B
 New York, NY 10023
 (917)-446-4641
 Fax: (954)-524-2822
 Email: ecf@epllc.com

 Bradley J. Edwards
 Brittany N. Henderson
 425 N. Andrews Ave., Suite 2
 Fort Lauderdale, FL 33301
 (954)-524-2820
 Fax: (954)-524-2822
 Email: brad@epllc.com
         brittany@epllc.com

 (*SEEKING ADMISSION PRO HAC VICE*)